# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MISSOURI
### WESTERN DIVISION

| | |
|---|---|
| JOHN HANIS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) No. 14-1107-CV-W-FJG |
| | ) |
| METROPOLITAN LIFE INSURANCE | ) |
| COMPANY and METLIFE GROUP, INC., | ) |
| | ) |
| Defendants. | ) |

## ORDER

Currently pending before the Court is Metropolitan Life Insurance Company ("MLIC's") and MetLife Group, Inc. ("MetLife Group's") Motion for Summary Judgment (Doc. #25), plaintiff's Motion to Certify Class Pursuant to 29 U.S.C.§216(b) (Doc. # 29) and plaintiff's Motion for Partial Summary Judgment (Doc. # 38).

### I. BACKGROUND

This is a putative collective action brought pursuant to the Fair Labor Standards Act. Plaintiff John Hanis is a former senior insurance underwriter for MetLife. MetLife Group and MLIC are separate and distinct wholly owned subsidiaries of non-defendant, MetLife, Inc., which provides various insurance, annuities, and employee benefit programs and products. MetLife Group offers a variety of "Group, Voluntary & Workplace Benefits" to employers seeking to provide group insurance coverage or optional benefits to their employees, such as dental, life, short-term disability, or long-term disability coverage. MetLife Group hired plaintiff to work in its Kansas City office in

June 2006 where he remained until he was terminated in October 2013. Plaintiff claims that MetLife improperly classified him as exempt from the overtime requirements of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 et seq. and denied him overtime pay for time worked in excess of 40 hours per week. Plaintiff has also raised a similar claim under the Missouri Wage Law. Mo.Rev.Stat.§ 290.500 et seq. MetLife argues that plaintiff was properly classified as an exempt "administrative" employee.

At the time he was hired, plaintiff had 25 years of experience as a group insurance underwriter. While working for MetLife, as a Senior Underwriter, plaintiff worked on underwriting cases involving up to 500 insured lives. Plaintiff provided underwriting services for multiple lines of coverage. Throughout his tenure with MetLife, plaintiff was paid on a salary basis at an annualized rate of more than $50,000 per year.

Plaintiff alleges that the primary job of a Senior Underwriter is "to provide internal underwriting services for MetLife." Plaintiff agreed that the following description in a MetLife training document represents a "good basic foundation" of the job of a group insurance underwriter: "Underwriting is a prospective exercise where decisions are made about the future plan design and rate for a group based on historical data. The role of the underwriter is multi-faceted. The primary responsibility of the underwriter is [(i)] Evaluating the risk of [a] specific group . . . [; (ii)] Determining appropriate plan design [; and (iii)] Establishing the rate (premium)." (Hanis Dep. at 118:11-22 & Dep.Ex. 16, ML000103-114; see also (Long Decl. ¶ 7, Ex. 2, ML000100 ("Underwriting Process Defined") (describing the "3 primary activities" of the "case underwriting process" as: (1) "Assessment of Risk"; (2) "Evaluation of Plan Design"; and (3) "Establishment of the Price"). The same training document also lists several "additional underwriting

2

responsibilities that are equally important to the success of [MetLife's] underwriting organization," which includes, inter alia: "Negotiation," "Decision Maker," "Benefits Consultant," "Knowledge expert on contract (MetLife and competitors)," and both "Gatekeeper– Internal" and "Gatekeeper–External." (Hanis Dep. at 118:11-22; Ex. D-16, Dep. Ex. 16, ML000103-114). Plaintiff testified that, as a Senior Underwriter, he did not market or sell MetLife's various lines of insurance directly to the employers or groups seeking coverage. (Hanis Dep. at 12:2-16). Plaintiff agreed that MetLife "sales reps are those who are responsible for selling insurance on behalf of MetLife" and who were primarily responsible for interacting directly with the employer seeking coverage (through its broker). (Hanis Dep. at 12:2-16). Plaintiff testified that, as an underwriter, he was "a couple of steps away from the actual customer" seeking coverage, and "very seldom would [he] ever contact or be in contact with the actual customer." (Hanis Dep. at 12:2-8). Plaintiff agreed that, typically, the employer (through an independent insurance broker) would "market the plan," meaning to "go find what the best insurance policy at the best price is." (Hanis Dep. at 12:9-12).  Plaintiff explained that after the employer's broker submits a request for a

proposal to a MetLife sales representative, the case would then be assigned to a MetLife Group underwriter. (Hanis Dep. at 24:1-7). Plaintiff explained that he "would talk with our sales reps on a daily basis, and part of it is they're trying to get a lower rate," while plaintiff's responsibility was "to keep the rate at a level that will continue to make a profit for the company." (Hanis Dep. at 14:5-14). Plaintiff agreed that during the process of settling on a rate, "there would be a lot of back-and-forth negotiation with the sales rep." (Hanis Dep. 100:15-18.). Plaintiff testified that, "I would give them the strong – the

3

points of – the facts of the case, and they would give me their argument of why they needed more, and then we would try to come to a mutual agreement." (Hanis Dep. 14:5-14.). Plaintiff would adjust the rate by gathering additional information to input into MetLife's computer systems which generated the rates and adjusting the margin within certain allowed parameters. Plaintiff explained that certain sales representatives preferred for him to be assigned to their cases in part "[b]ecause I would often look at their cases more than just doing a production thing and running it through." (Hanis Dep. at 59:20-25). Plaintiff agreed that "of course" there were times when his goal of underwriting "business for a profit . . . to MetLife" conflicted with a sales representative's objective of selling the case and "trying to get the best offer." (Hanis Dep. at 10:7-17). Plaintiff testified that in the event of such a conflict, his "ultimate responsibility" as "gatekeeper" was "to safeguard MetLife and MetLife's profit." (Hanis Dep. at 19:6-12). Plaintiff testified that there "[a]bsolutely" were times "when no matter how much [he] wanted to help a particular sales rep, [he] felt [he] couldn't do so because of [his] gatekeeper role." (Hanis Dep. at 99:4-7). Plaintiff explained that MetLife's sales representatives receive commissions based on sales—"they got money if they sold cases"—while he did not receive any commission compensation. (Hanis Dep. at 100:24-101:5).

Plaintiff agreed that "if the underwriter as the gatekeeper . . . gets it wrong, there could be significant financial impact to MetLife." (Hanis Dep. 20:20-23). Plaintiff also testified that the consequence if "the underwriter is making the wrong call in terms of how he or she is pricing" would be that "[MetLife] could lose money." (Hanis Dep. at 33:9-18). At the time of plaintiff's termination in October 2013, he had an annual

4

"premium limit" of $500,000. (Hanis Dep. at 22:17-20, 123:21-25, 124:20-23). Plaintiff wrote in a self-assessment for 2012 that overall sales for his cases resulted in more than $2,000,000 of total annual premiums to MetLife. (Hanis Dep. at 112:19-113:2; 113:19-25 & Ex. D-15, Dep. Ex. 15, ML000290, at 295). Plaintiff testified that his underwriting decision-making had a direct effect on the corresponding risk of potential exposure and/or liability MetLife would owe in claims to insured policyholders. (Hanis Dep. at 124:24-125:4 ("I mean, as premium increases, there's more inherent risk."); see also Id. at 127:5-128:14.).

Plaintiff testified that so long as a case was within his lives and premium authority, he "was able to quote them" and "could do the pricings" independently and without any consultation with a manager or supervisor. (Hanis Dep. at 22:10-16, 22:21-23:13). Plaintiff agreed that "it was up to [him] to decide whether or not to seek advice from others," stating that "[w]hen I really went beyond most of the standard guidelines, that's when you confer with others." (Hanis Dep. at 78:7-16; see also Id. at 23:18-20).

Plaintiff testified that, upon being assigned a case, he would receive an email containing the information "that I would need to do my analysis," which typically included census and demographic data for the entire group, the "current plan design" the group was seeking for the various lines of coverage, any "past claims experience" the group had, and other background information about the employer, such as "where they're located, what they do." (Hanis Dep. at 25:7-27:16). Plaintiff also analyzed the specific plan design the group sought, stating that it was important because it "is sometimes tailored to the needs of that particular group," which in turn could impact the rates

plaintiff quoted for the coverage. (Hanis Dep. at 26:14-24). Plaintiff used the plan design to understand what factors to put into the system to generate the best rate, while still allowing MetLife to make a profit. Plaintiff explained that reviewing the group's "past claims experience" would "show how the experience of that particular plan affected their claims. Maybe there was something in that plan that I saw that maybe we don't want to do, and that depended on what detail of information that I was given," also agreeing that past claims experience "would be important to determine the risk factor going forward for MetLife." (Hanis Dep. at 26:25-27:12). Plaintiff testified that there were times when he decided that he needed more information than he was provided initially in order to proceed with a quote, in which case he also decided what information to request from the employer and could reach out to the employer's broker directly. (Hanis Dep. at 27:13-28:5). Plaintiff explained that if he was provided with additional information, he could put that into the system and sometimes achieve a better rate and apply a more aggressive margin because of the confidence of the information. (Hanis Dep. at 29:3-13). Plaintiff also testified that it was his responsibility as an underwriter to identify any anomalies in a group's census data and, if so, whether they were acceptable or whether the anomaly "might be a red flag for us to ask more questions." (Hanis Dep. at 34:10-36:1). Plaintiff testified that, in addition to demographic data, he often would assess various sources of financial information about the employer seeking coverage, including the company's financial statements and other publicly available information, to analyze the perceived strength or weakness of the company. (Hanis Dep. at 15:18-25, 19:13-20:19).

Plaintiff explained that he also had to make an initial determination of an

appropriate "Standard Industrial Code" ("SIC") for the particular employees within any given group, a decision within his discretion and authority without manager approval. (Hanis Dep. at 15:12-17:10, 41:14-25). Plaintiff explained that the SIC categorizes the specific industry or occupation in which the employees within the group work, as different occupations or industries carry different risk profiles. (Hanis Dep. at 41:14-42:19, 48:14-20). Plaintiff testified that the risk profile of different industries or occupations also can "depend on the coverage" the employer seeks. (Hanis Dep. at 42:6-19). Plaintiff testified that it was important to determine an appropriate SIC for a particular group, as getting the wrong code "could affect [the rates] anywhere from a couple of percent to maybe even 10 or 15 percent if it was really well off." (Hanis Dep. at 16:1-16; see also id. at 41:21-25). Plaintiff testified that he would sometimes "get creative" when analyzing a SIC, and if he "didn't feel comfortable with just the basic data that came" from the employer, he would try "thinking of some possibilities of maybe additional questions to ask them that could help reduce the rate" and try to get "additional information, and by doing so, I might be able to come up with a different SIC code." (Hanis Dep. at 46:10-47:12 & Ex. D-5, Dep. Ex. 5, ML000886).

Plaintiff testified that when the system did not generate a competitive rate, he would recommend different options for the customer to consider in order to help the sales representative achieve the sale. (Hanis Dep. at 58:8-23; 61:8-62:9). In plaintiff's self-assessment of his performance during 2012, he noted that he had "[b]een aggressive much of the year in suggesting alternative plan options in addition to what was suggested by the broker or rep, which I believe has helped in my success in having

several hundred – several 500-plus cases sold and overall sales of more than $2,000,000." (Hanis Dep. at 112:19-113:7 & Ex. D-15, Dep. Ex. 15, ML000290, at 295).

Plaintiff testified that he had the discretion and authority to decide not to issue a quote—"decline to quote" or "DTQ"—for a particular case, agreeing that this is "a decision that the underwriter makes." (Hanis Dep. at 28:13-19, 90:20-25). Plaintiff explained that he could decline to quote a particular case "for various reasons," including, for example, if plaintiff determined that MetLife is "not competitive, and there's nothing that [he] can see to make us competitive"; if MetLife is not "able to match the current plan design"; if the group's industry was one MetLife typically would not quote; or, most frequently, if plaintiff "felt [he] had insufficient data" such that he was not "in a position to adequately assess risk." (Hanis Dep. at 91:1-92:7). Plaintiff testified that his decision to decline to quote was not typically reviewed by a manager before plaintiff made his decision, nor was manager approval required. (Hanis Dep. at 28:13-19, 92:20-93:20). Plaintiff explained that his decisions to decline to quote were rarely reversed or questioned by a manager "because [plaintiff] gave real good reasons" for his decisions. (Hanis Dep. at 92:8-93:20).

Plaintiff testified that after the steps above, he would then determine a "manual rate" for the case using a computer program called "IMPAQS," which he referred to as a "rating tool." (Hanis Dep. at 40:8-25; 50:3-18). Plaintiff explained that the IMPAQS program required several inputs, including the SIC, the plan design, and the census and demographic data. (Hanis Dep. at 50:3-18). Plaintiff explained that on occasions where he did not have all of the information needed to run a "manual" rating in IMPAQS, he might have to make certain assumptions. (Hanis Dep. at 51:6-51:19).

8

Plaintiff agreed that the "manual" rate provided by IMPAQS represented "a starting point for [him], as opposed to an end point." (Hanis Dep. at 56:17-20). When asked in his deposition if he would "stop [his] analysis with what the computer spits out," plaintiff answered: "Primarily I did not. I did my job of doing the best I could." (Hanis Dep. at 56:10-16). According to plaintiff, "if you don't ask the additional questions, you might come up with the best result that your system gave you, but you did not give your sales rep the best potential offer that you could do." (Hanis Dep. at 111:25-112:4). Plaintiff testified that if the "manual" rate suggested that MetLife is "not going to be competitive and it's basically now a lost cause," he might consider, "is there something I can do to work with my sales rep to give him the rate that he might be able to sell? And that's when we would collaborate between each other[.]" (Hanis Dep. at 57:7-17). Plaintiff testified that he might also consider whether modifications to the variables underlying the "manual rate" might affect the outcome, such as altering the SIC or obtaining additional information. (Hanis Dep. at 57:7-58:23). If a case is exclusively a "manually rated" case—meaning there was no additional "experience rating"—plaintiff still had to assess how the "manual" rates compared to the rates the employer was currently paying, and whether and to what extent to use his available "margin" to establish a final rate. (Hanis Dep. at 51:23-52:6).

As a Senior Underwriter working primarily on larger groups, plaintiff typically also did an "experience analysis" on "[m]ost of the cases," and he rarely worked on exclusively "manual" rate cases. (Hanis Dep. at 21:13-21, 24:15-17, 67:15-21, 68:10-14). Plaintiff testified that under certain circumstances, "possibly the entire weight would be based off of the experience and not the manual rate" established

9

through the IMPAQS program. (Hanis Dep. at 68:4-6). Plaintiff explained that the "experience rating" process refers to an additional analysis that incorporates the particular group's prior insurance coverage and claims history—"to utilize the claims information from the former carrier or the current carrier." (Hanis Dep. at 17:13-20; id. at 24:18-22 (experience rating a case means "if you had past experience to be part of the factor of your final rate"). Plaintiff agreed that the objective of "experience rating" is "to predict how claims will run based on past experience." (Hanis Dep. at 67:22-68:18; see also id. at 27:9-12 (a group's past claims experience is important to determine the risk factor for MetLife going forward). Plaintiff confirmed at his deposition that an email he wrote to a MetLife sales representative identified the "key components of the experience rating process," which includes several steps and lists various sources of information. (Hanis Dep. at 69:16-70:13). Included among these "key components" are, inter alia: "premium vs. lives analysis," "[w]hether claims are mature or immature," "rate history" and the "trend of how a former carrier thought the case was doing," the "weights" assigned to the experience, and the "credibility" of the experience." (Hanis Dep. at 69:16-86:23). Plaintiff also testified that so long as he was acting within his authority, he had the ability to change the "weighting" assigned to a particular year's experience data "[a]s I saw that it fit the risk." (Hanis Dep. at 78:1-6). Plaintiff testified that although MetLife guidelines often provided a "default weighting" to afford experience data, plaintiff had discretion to "modify it" and "shift away from the default weighting" under certain circumstances and armed with appropriate information. (Hanis Dep. at 73:24-75:18). At the end of the experience rating, after all of the data has been input, the computer yields an experience rate and a blended rate, using algorithms that are

10

programmed into a spreadsheet, which also produce a credibility factor. (Dep. Tom Long, p..149:11-19). Senior underwriters then choose which rate to work from. Tom Long testified that "its an underwriting decision based on how aggressive they want to be. They are free to omit data, throw pieces of it out, throw pieces of it into the best of their knowledge, and then oftentimes they can change the credibility. So, it might be, you know, 70 percent credible, and they might make the decision that I have a great feeling about this case. I think it's churning the right way. I'm going to give it 100 percent credibility because experience is improving every year. So I'm going to accelerate credibility and base it all on experience." (Dep. Tom Long, p.149:24-150:10).

Plaintiff explained that before issuing a final quote, he had discretion to determine what "margin" to apply within his permissible range, which he did without the approval of or consultation with a manager or supervisor. (Hanis Dep. at 51:23-52:6, 62:16-21, 63:10-22). Plaintiff testified that even in "manually rated" cases, after obtaining the manual rate from the IMPAQS program, he still had to decide what margin to use within his permissible range before sending the rates out to the sales representative. (Hanis Dep. at 51:23-52:6). Plaintiff testified that the "manual rate" process automatically incorporates a default margin of "plus six" into the rate provided by IMPAQS. (Hanis Dep. at 63:3-7). Plaintiff explained that he had the discretion to reduce the applicable margin to as low as "minus-two" without manager approval. (Hanis Dep. at 63:2-22). Plaintiff testified that depending on factors such as "how good of details, how good of information I had about the case, how comfortable I felt with it . . . [or] the trend of the claims," "that's when I would perhaps go to my manager and maybe we should go even further because I see a lot of what we call . . . good case

characteristics." (Hanis Dep. at 64:20-65:9). Plaintiff explained that in deciding upon an appropriate margin level for quoting each type of coverage he underwrote, he was expected to "carefully evaluate[]" numerous different "case characteristics" spanning several "risk categories." (Hanis Dep. at 89:8-90:17 & Ex. D-12, Dep. Ex. 12 (ML000138-141)). Plaintiff testified that he, as the underwriter, was responsible for "decid[ing] how much weight to give to each of these positive or negative case characteristics," and that "they were part of our judgment." (Hanis Dep. at 89:8-90:17). Plaintiff agreed that part of his decision on "where [he] moved within [his margin] range depended on how aggressive [he] wanted to be on a specific case," although he stated that "it wasn't just that." (Hanis Dep. at 64:20-23). Plaintiff went on to explain that his decision might be based on the quality of the information he had and "how comfortable I felt with it"; the "trend of the claims" for the group; whether the group had "stayed with the same carrier for years rather than shopping around from year to year"; the "type of people who were being covered by the policy," for example, "we preferred, again, blue-collar versus white-collar groups"; or "if there were a fewer number of high-risk people, that would be a better case characteristic." (Hanis Dep. at 64:20-66:25).

Plaintiff testified that in performing his duties as a Senior Underwriter, he used certain "guidelines" in helping him assess risk. (Hanis Dep. at 87:1-24.) Plaintiff referred to the underwriting "guidelines" as "a tool [he] used" in performing his job duties. (Hanis Dep. at 87:13-14). According to plaintiff, these guidelines covered various topics, including "margin, what risk that we could quote, . . .why the risk[s] were determined to be good, bad, or otherwise. It had a lot of variations of eligibility, status, who we might want to – the types of questions we might want to ask and so forth. I

12

mean, it was just a broad overview of general underwriting." (Hanis Dep. at 87:1-12).

Plaintiff testified that he "did the research work" and believed that "looking for additional

ways of improving [the] quote" was "part of my job and expected of me" and was, in fact,

what he "brought to the table" as an underwriter. (Hanis Dep. at 60:10-24).

## II. STANDARD

A moving party is entitled to summary judgment on a claim only if there is a

showing that "there is no genuine issue as to any material fact and that the moving party

is entitled to a judgment as a matter of law."  Fed.R.Civ.P. 56(c). "[T]he substantive law

will identify which facts are material.  Only disputes over facts that might affect the

outcome of the suit under the governing law will properly preclude the entry of summary

judgment."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91

L.Ed.2d 202 (1986).  If the moving party meets this requirement, the burden shifts to the

non-moving party to "set forth specific facts showing that there is a genuine issue for

trial."  Anderson, 477 U.S. 242, 248 (1986).  In Matsushita Electric  Industrial Co. Ltd. v.

Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), the

Court emphasized that the party opposing summary judgment "must do more than

simply show that there is some metaphysical doubt as to the material facts" in order to

establish a genuine issue of fact sufficient to warrant trial.  In reviewing a motion for

summary judgment, the court must view the evidence in the light most favorable to the

non-moving party, giving that party the benefit of all inferences that may be reasonably

drawn from the evidence.  Matsushia, 475 U.S. 574, 588; Tyler v. Harper, 744 F.2d 653,

655 (8th Cir. 1984), cert. denied, 470 U.S. 1057 (1985).

In Lutz v. Huntington Bancshares Inc., No. 2:12-CV-01091, 2014 WL 2890170

(S.D. Ohio June 25, 2014), aff'd, 815 F.3d 988 (6th Cir. 2016), the Court explained:

> The exemptions to the FLSA's overtime provisions are to be narrowly construed against the employers seeking to assert [them]. . . .[T]he employer bears not only the burden of proof, but also the burden on each element of the claimed exemption. . . .Defendants must prove each element of the claimed exemption by a preponderance of the evidence. . . .Because the burden of proof is shifted, [the plaintiff] is entitled to summary judgment unless [the defendant] can come forward with evidence at least creating a genuine issue of material fact as to whether [the plaintiff] meets each and every element of the exemption. . . .If [the defendant] fails to proffer such evidence, not only must its motion for summary judgment be denied, but summary judgment for [the plaintiff] must be granted.

Id. at *6 (internal citations and quotations omitted).

### III. DISCUSSION

The parties have filed cross-motions for summary judgment on the issue of plaintiff's proper classification under the FLSA and whether MetLife was required to pay plaintiff overtime compensation.  MetLife maintains that it is entitled to summary judgment because Hanis was an exempt "administrative" employee as a matter of law.  29 U.S.C. §213(a)(1); 29 C.F.R.§541.200(a). Hanis's motion seeks summary judgment on the same issue and one additional issue concerning the appropriate method for calculating damages. The Missouri Wage Law incorporates the FLSA's exemptions from overtime liability, Mo.Rev.Stat. §290.505(3), so the Court's ruling applies equally to plaintiff's claims under both statutes.

### A. FLSA and the Administrative Exemption

> The FLSA requires employers to pay their employees overtime for work performed in excess of forty hours per week. 29 U.S.C. §207(a)(1). But this provision does not apply to individuals "employed in a bona fide . . .administrative. . .capacity." 29 U.S.C. §213(a)(1). An employee working in a "bona fide administrative capacity" is someone:

> > (1) Compensated on a salary or fee basis at a rate of not

14

less than $455 per week . . .;

    (2) Whose primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers; *and*

    (3) Whose primary duty includes the exercise of discretion and independent judgment with respect to matters of significance.

29 C.F.R. § 541.200(a)(emphasis added). . . .An employee who satisfies all three elements falls within this "administrative exemption."

Lutz v. Huntington Bancshares, Inc., 815 F.3d 988, 992 (6th Cir.2016).

### 1. Compensation

The parties do not dispute that plaintiff was paid on a salary basis in excess of $455 per week. In the three years preceding this lawsuit, plaintiff was paid an annual salary of over $50,000 per year, equating to more than $1,000 per week.

### 2. Whether Plaintiff's Primary Duties Were Directly Related to the Management or General Business Operations of the Employer.

The term "primary duty" means "the principal, main, major or most important duty that the employee performs." 29 C.F.R. §541.700(a). Plaintiff argues that in determining whether an employee's "primary duty" is directly related to the management or general business operations, courts have applied the "administrative/production dichotomy to distinguish administrative work from production work. The DOL regulations define administrative employees as those employees who "perform work directly related to assisting with the running or servicing of the business, as distinguished, for example, from working on a manufacturing production line or selling a product in a retail or service establishment." 29 C.F.R. § 541.201(a). The regulations provide some examples of work which is directly related to management or general business

15

operations: "work in functional areas such as tax; finance; accounting; budgeting; auditing; insurance; quality control; purchasing; procurement; advertising; marketing; research; safety and health; personnel management; human resources; employee benefits; labor relations; public relations, government relations; computer network, internet and database administration; legal and regulatory compliance; and similar activities." 29 C.F.R. § 541.201(b).

Plaintiff argues that as an underwriter, he qualifies as a production employee because MetLife uses underwriters to provide the pricing and profit for their products and without underwriters the sales representatives could not present insurance policies to clients for sale. In support of his position that insurance underwriters should be considered production employees, plaintiff relies on Graves v. Chubb & Son, Inc., No. 3:12-CV-568(JCH), 2014 WL 1289464 (D.Conn. Mar. 31, 2014). In that case, the Court found that it could not grant summary judgment for either party, because there was no clear picture of what the plaintiff's primary duty was. Additionally, the Court found that there were also disputed facts as to whether the plaintiff exercised discretion and independent judgment. In the instant case, the Court finds Graves distinguishable because the facts in this case do provide a clear picture of what plaintiff's job duties were.

Plaintiff also argues that "non-manufacturing employees can be considered 'production' employees in those instances where their job is to generate (i.e. 'produce') the very product or service that the employer's business offers to the public." Reich v. John Alden Life Ins. Co., 126 F.3d 1, 9 (1st Cir. 1997). Plaintiff states that courts have distinguished between an insurance adjuster, who advises management, represents the

company and negotiates claims and who would be exempt from individuals who were

involved with the writing and selling of insurance and were production employees.

Plaintiff testified in his deposition that his ultimate responsibility was to "safeguard

MetLife and MetLife's profit." He stated, "[a]n underwriter is the –is basically called the

gatekeeper." (Hanis Dep. p. 19). In developing a quote for a policy, plaintiff testified that

he would:

> Put it in through the MetLife—what they had for the rating tool was their
> IMPAQS system –I-M-P-A-Q-S.  I can't remember what it represents, but it
> was the company-wide rating tool to get a manual rate based on the plan,
> based on the census date that was provided, including the risk of the SIC
> and so forth. And then if they had experience, I would go through the
> Excel spreadsheet that was supplied, that we would put in the claims data
> and weigh that claims data to the manual rate to come up with a final net
> rate.

(Hanis Dep. p. 40). Tom Long, MetLife's Director of Small Market Underwriting

confirmed this understanding of the job of an underwriter.  Mr. Long stated that in

getting a quote to a client:

> An analyst or an underwriter needs to evaluate the information that is
> given to them concerning the demographics of a particular group,
> concerning the industry of a particular group, considering plan design of a
> particular group, and how that might impact the risk that's being assumed.
>  Cases that an analyst would work on would be more manually
> underwritten, so the manual rates are being looked at, but an underwriter
> has -- an analyst  has a lot of decision points along the way about
>  whether or not, you know, how they run those manual rates. So a good
> example would be LTD. We have to apply an occupational code to
> everybody in a group. How that underwriter does that, underwriting analyst
> or underwriter does that, is really based on their own assessment of that
> particular job title and what the risk might be. So sometimes you use your
> own -- your own experience in doing that. . . . So then I decide on my plan
> decide, and then I decide on my price, again, I'm going to issue a
> quote. Oftentimes there's negotiation back and forth after the case. A
> salesperson might come back with additional information that wasn't
> available prior that may make the underwriter think differently about
> their initial pricing decision or there may be competitive information we
> didn't have before that, you know, might entice us to either move off the

17

rate or hold firm, kind of depends on, you know, what the information is. So all that negotiation and stuff kind of goes on after you actually issue the quote. There's alot of back and forth. So a case normally isn't open and shut. I underwrite, I send it out, and I'm done with it. It's -- it's got a much longer tail to it.

(Long Dep. pp. 88-89; 92-93). MetLife notes that plaintiff's testimony about negotiations with the sales representatives show that his duty was to MetLife's long-term interests and overall business. If plaintiff's duty were to simply churn out insurance policies, then such negotiations would be unnecessary. Plaintiff testified that there were times when the goal of earning a profit for MetLife was in conflict with what the sales representatives were trying to do. Hanis testified, "[t]hey're trying to get the best offer. I had to – my job was to follow the company guidelines, the system that we had which provided us with the data, and then we had limitations to what we could do and what we could not do." (Hanis Dep. p.10).

MetLife argues that plaintiff's job duties were consistent with the examples of "functional" duties that the DOL considers exempt administrative work. MetLife notes that the common element among these areas – insurance, quality control, purchasing, research, legal and regulatory compliance – is that "each function inures to the *employer's* business or is done on behalf of the *employer's* broader interests, as opposed to advancing narrower, short-term goals of "producing" a product or making a particular sale. . . .Here plaintiff did not generate MetLife's business, nor did he "produce" the insurance policies MetLife ultimately issued. . . .Rather, his job was ancillary to, and often *conflicted* with, MetLife's goal of selling new business, as his duty was to maintain underwriting integrity and protect *MetLife.*" (Defendant's Suggestions in Support, p. 34).

18

Three courts have analyzed whether insurance underwriters fit within the administrative exemption. In Edwards v. Audubon Insur. Group, Inc., No. 3:02-CV-1618-WS, 2004 WL 3119911 (S.D.Miss. Aug.31, 2004), the Court noted in that case that the "underwriters have significant autonomy and a primary duty directly related to general business operations and of substantial importance to Audubon and its customers. Underwriters decide what risks the company would take and at what price, which is clearly exempt work." Id. at *5. The Court rejected the plaintiff's assertion that he was a "production" worker who produced products or policies for the insurance company. The Court noted that the "administrative-production" dichotomy is not a rule of law. Rather, this dichotomy has always been only 'illustrative-but not dispositive-of exempt status;' is but " 'one analytical tool' that should be used 'toward answering the ultimate question [of exempt status];' and is only determinative if the work 'falls squarely on the production side of the line.'" Id. at *5.

Similarly, in Maddox v. Continental Cas. Co., No. CV 11-2451-JFW(PLAx), 2011 WL 6825483 (C.D.Cal. Dec. 22, 2011), plaintiff was a senior level underwriter for CNA insurance company. In that position the plaintiff gathered various types of information, from brokers, insurance applications, information regarding losses, nature of the client's business and reports prepared by CNA's risk control department. Similar to the instant case, in Maddox the plaintiff was required to "independently determine whether the risk was acceptable to CNA, and if so, how to price that risk to hopefully ensure that CNA made a profit." Id. at *1. Much like Hanis, the underwriter in Maddox, utilized a computer rating tool and also analyzed and considered a variety of other factors. The court found that plaintiff in that case "had exclusive discretion to evaluate risks, determine their

19

acceptability, determine the appropriate premium to quote to the broker, and bind CNA to the policy." Id. at *2. The Court rejected plaintiff's assertion that he should be considered a "production worker" because he spent a considerable amount of time "selling" CNA's insurance policies. The Court determined that "the administrative/ production dichotomy is of minimal assistance, and given the nature of Plaintiff's duties and responsibilities, the Court concludes that Plaintiff performed work directly related to management policies or general business operations of CNA or CNA's customers." Id. at *5.

The other case which has considered whether insurance underwriters duties are directly related to the management or general business operations of their employer is Graves v. Chubb & Sons, No. 3:12-CV-568(JCH), 2014 WL 1289464, *6 (D.Conn. Mar. 31, 2014). However this case is not particularly instructive, because as noted above, the Court found that there was "[n]o clear picture of Graves's primary duty." Thus, the Court found that it could not grant summary judgment in favor of either party due to the disputed facts.

The Court finds that after reviewing Hanis's testimony regarding his job duties that much like the plaintiff in Lutz v. Huntington Bancshares, Inc., 815 F.3d 988 (6th Cir. 2016), "while the underwriters' duties touch on Huntington's principal production activity of selling loans, the underwriters exist primarily to service the Bank by advising whether it should accept the credit risk posed by its customers." Id. at 993. Similarly, in the instant case, while Hanis's duties touch on MetLife's business of selling insurance policies, his duties were primarily focused on protecting and supporting MetLife and advising whether MetLife should accept a particular risk. Accordingly, the Court finds

20

that MetLife has met is burden of demonstrating that plaintiff's primary duties were

directly related to the management or general business operations of MetLife.

### 3. Exercise of Discretion and Independent Judgment

> To qualify for the administrative exemption, an employee's primary duty must include the exercise of discretion and independent judgment with respect to matters of significance. In general, the exercise of discretion and independent judgment involves the comparison and the evaluation of possible courses of conduct, and acting or making a decision after the various possibilities have been considered. The term "matters of significance" refers to the level of importance or consequence of the work performed.

29 C.F.R. § 541.202(a).

> Factors to consider when determining whether an employee exercises discretion and independent judgment with respect to matters of significance include, but are not limited to: whether the employee has authority to formulate, affect, interpret, or implement management policies or operating practices; whether the employee carries out major assignments in conducting the operations of the business; whether the employee performs work that affects business operations to a substantial degree, even if the employee's assignments are related to operation of a particular segment of the business; whether the employee has authority to commit the employer in matters that have significant financial impact; whether the employee has authority to waive or deviate from established policies and procedures without prior approval; whether the employee has authority to negotiate and bind the company on significant matters; whether the employee provides consultation or expert advice to management; whether the employee is involved in planning long- or short-term business objectives; whether the employee investigates and resolves matters of significance on behalf of management; and whether the employee represents the company in handling complaints, arbitrating disputes or resolving grievances.

29 C.F.R. § 541.202(b).

The regulations also note that "employees can exercise discretion and independent

judgment even if their decisions or recommendations are reviewed at a higher level." 29

C.F.R. § 541.202(c). "The fact that an employee's decision may be subject to review

and that upon occasion the decisions are revised or reversed after review does not

mean that the employee is not exercising discretion and independent judgment." Id.

MetLife in its motion outlines all of the ways that Hanis used discretion and judgment in fulfilling his duties:

- Plaintiff had complete discretion to decline to quote a case, for "various reasons," and without manager approval or consultation. Declining to quote a case is "*a decision that the underwriter makes*" (emphasis added) (Hanis Dep. p.28; 90).

- Within his substantial 500-lives and $500,000-premium authority, plaintiff was singly responsible for deciding whether, and at what price, MetLife would accept the risk of the requested coverage and could bind MetLife to offering those rates. (Hanis Dep. p. 22-23).

- He evaluated various factors and information pertaining to the risk of each unique group of employees seeking coverage, including determining whether the information was sufficient to quote the case or whether to request more. (Hanis Dep. p. 15, 27-28).

- He decided what SIC to assign a particular group of employees—a decision with material impact on the risk profile and, thus, the quoted rates—and often got "creative" by doing independent research and blending multiple SICs. (Hanis Dep. pp. 16-17, 46).

- In his own words, plaintiff was "not hesitant to recommend plan changes, etc. when [he] believe[d] they make sense." (Hanis Dep. p. 61).

- Although MetLife often provided a 'default weighting,' he had discretion to modify it and "shift it away from the default weighting under certain circumstances." (Hanis Dep. p. 73-75).

- He decided an appropriate margin—allowing him to be "aggressive" or "conservative" with his final quote, depending on the circumstances—only after evaluating dozens of "case characteristics" for each line of coverage and deciding, as "part of our judgment" (Hanis Dep. pp. 89-90).

- Plaintiff independently "negotiated" with sales representatives on a daily basis, acting as the final "gatekeeper" before MetLife issued a quote to an employer, and even had the discretion to reverse or modify his previous decision. (Hanis Dep. pp.19; 94, 100).

- Even if a case was outside his authority, plaintiff analyzed it as usual, determined an appropriate rate (or declined to quote), and used his "negotiation skills" to make a recommendation. Indeed, whether to even *seek* an exception or suggest

22

exceeding his authority was his decision. (Hanis Dep. 21-22; 97-98).

In opposition, plaintiff states that underwriters at MetLife do not formulate, interpret, affect or implement management policies.  Nor do they have the ability to commit MetLife to anything.   Plaintiff states that underwriters do not represent MetLife in handling complaints, nor do they plan short or long term business strategies or provide expert advice to management.  However, simply because underwriters do not perform every function listed as an example in the DOL regulations, does not mean that they do not exercise discretion and independent judgment in exercising other duties. Plaintiff also attempts to argue that underwriters use well-established techniques and procedures which are based on manuals, guidelines and other established procedures to perform their jobs and do not actually exercise discretion or independent  judgment. Plaintiff argues that the record reveals that the guidelines and manuals used by underwriters were merely a list of information that they would use to input into the databases which would perform the analysis for MetLife in determining the price point at which the policy would be offered. Thus, plaintiff argues that "[t]his is hardly the kind of 'highly technical, scientific, legal or financial' matter contemplated by the regulations." However, simply because an employee is required to follow detailed manuals does not mean she did not exercise discretion and independent judgment.  In <u>McAllister v. Transamerica Occidental Life Ins. Co.</u>, 325 F.3d 997, 1001 (8th Cir. 2003), a claims examiner was required to follow detailed manuals, but the Court found that she nevertheless exercised discretion and independent judgment when she interpreted contract law and insurance statutes and approved claims and decided whether to pursue investigations.

23

In <u>Lutz</u>, 2014 WL 2890170 (S.D. Ohio 2014), the Court found that the loan underwriters in that case used a software program incorporating information from the customer's loan application and produce calculations and make a recommendation as to whether the loan should be approved. However, the Court noted that there were many more steps which the underwriters took such as:

> review the software recommendation and determine whether to accept or override it, meaning that he or she must decide whether additional materials are necessary before the Bank can make a loan decision, whether to place stipulations on the application, whether to make an exception based on factors such as the customer's history with the Bank, whether a different loan product should be offered to the customer, and whether other factors (such as the customer's age and circumstances) raise concerns that would cause the Bank to question a loan it otherwise would have approved. The fact that the Bank even needs human underwriters-in addition to its software programs-suggests that the decisions at issue are more than just mechanical calculations. In other words, it suggests that [underwriters] necessarily exercise discretion and judgment of which a software program is not capable.

<u>Id</u>. at *17. The Court also noted that two other factors were determinative in deciding that the underwriters exercised discretion and independent judgment. The first factor was that the underwriters have the authority to approve or deny a loan application. The underwriters had the authority to approve applications valued at between $250,000 and $1,000,000. Thus, the Court found that they had the authority to bind the Bank to significant financial commitments. Secondly, the Court found that although tempered by the Bank's lending criteria, the underwriters have the "authority to waive or deviate from [that criteria] without prior approval." "Plaintiffs can, in certain circumstances, deviate from the Bank's lending criteria by declining to approve a loan that meets that criteria and/or making exceptions in order to approve a loan that does not." <u>Id</u>. at *18.

In the instant case, the Court finds that the functions of the MetLife underwriters

are strikingly similar to the functions of the loan underwriters discussed in Lutz. Plaintiff in this case testified that when a request for a quote was assigned to him, he took the information provided and input the data into MetLife's software program. However, even when entering the information, plaintiff had to decide the correct SIC code to enter, what plan design to input, the census information, etc. Plaintiff testified that the number that the computer system gave him though was just a starting point and that he would look to see what other factors he could include to generate a better rate quote. Plaintiff also testified that as a senior underwriter he would also recommend different types of plan designs that would in turn affect the quote. In addition to using MetLife's software program to manually rating cases, plaintiff as a senior underwriter also performed experience ratings on his cases. Inputting this information however also involved a series of decisions about what information to use such as "premium vs. lives analysis," claims maturity, rate history and the trend of how the former carrier thought the case was doing. An underwriter also assigned weights to the experience and to the "credibility" of the experience. Even though MetLife underwriters utilized software programs, it is obvious that they also utilized a substantial amount of discretion and independent judgment in determining how the information was input into these systems and how the information was utilized, once the computer had analyzed it.

Additionally, as in Lutz, underwriters at MetLife had "authority to commit the employer in matters that have significant financial impact." 29 C.F.R. §541.202(b). It was the underwriters at MetLife who supplied the sales representatives with the rates for a particular plan. Plaintiff testified that unless he or his supervisor gave approval for a particular rate, the salesperson could not quote that rate to the broker. At the time of

25

his termination, plaintiff had an annual premium limit of $500,000. In 2012, plaintiff estimated that his overall sales for his cases resulted in more than $2,000,000 of total annual premiums to MetLife. Thus, the Court finds that plaintiff had the authority to commit MetLife in significant matters.

With regard to the second factor the court in Lutz identified, the Court finds that plaintiff also had the "authority to waive or deviate from [the Bank's lending criteria] without prior approval." Id. at *18. Plaintiff testified that so long as a case was within his lives and premium authority, he "was able to quote them" and "could do the pricings" independently and without any consultation with a manager or supervisor. (Hanis Dep. p.22-23). Additionally, plaintiff explained that in applying a margin to a case, the computer system automatically incorporates a default margin of "plus six", but he had discretion to reduce the margin to as low as "minus two" without manager approval. He also testified that you could always apply a higher margin. Plaintiff testified that he would work within these margin levels to get the most advantageous quote for the sales representative. Part of his analysis on how he adjusted the margin depended on how aggressive he wanted to be on a particular case and other good and bad "case characteristics." Plaintiff also testified that he could decline to quote a particular case for various reasons and that his decision to decline to quote a case was not typically reviewed by a manager.

The Court finds that the evidence in this case demonstrates that in his position as an underwriter, plaintiff exercised considerable discretion and independent judgment on matters of significance in reviewing and analyzing the information necessary to generate insurance quotes. Therefore, the Court finds that MetLife has met its burden

to show that plaintiff meets the second prong of the administrative exemption test. Because MetLife has shown that plaintiff meets the salary requirement, performed work which was directly related to the general business operations of MetLife and that his primary duties included the exercise of discretion and independent judgment on matters of significance, the Court finds that MetLife has demonstrated that plaintiff is employed in a "bona fide administrative capacity" and is therefore exempt from paying overtime wages.

## IV. CONCLUSION

Accordingly, the Court hereby **GRANTS** MetLife's Motion for Summary Judgment (Doc. # 25) and **DENIES** Plaintiff's Motion for Partial Summary Judgment (Doc. # 38) and **DENIES AS MOOT** Plaintiff's Motion to Certify a Class Pursuant to 29 U.S.C.§ 216(b) (Doc. # 29).


Date: September 29, 2016                          **S/ FERNANDO J. GAITAN, JR.**
Kansas City, Missouri                             Fernando J. Gaitan, Jr.
                                                  United States District Judge

27